# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

─────────────

m 99-60910
Summary Calendar

─────────────


KING DAVID RUSH,

Plaintiff-Appellant,

VERSUS

COLUMBUS MUNICIPAL SCHOOL DISTRICT;
GLENN LAUTZENHISER,
IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;
JANNETTE ADAMS,
IN HER OFFICIAL AND INDIVIDUAL CAPACITY;
SARA JONES,
IN HER OFFICIAL AND INDIVIDUAL CAPACITY;
JAN KLING,
IN HER OFFICIAL AND INDIVIDUAL CAPACITY,

Defendants-Appellees.


─────────────────────────

Appeal from the United States District Court
for the Northern District of Mississippi
(1:98-CV-193)

─────────────────────────

September 28, 2000

Before SMITH, BENAVIDES, and
    DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

King Rush appeals a summary judgment in favor of Columbus Municipal School District (the "District") and its board members on Rush's 42 U.S.C. § 1983 action relating to the refusal to rehire him as an assistant principal. Rush also appeals the denial of his motion to compel the disclosure of discussions among members of the District's school board (the "Board") during executive session. Because we conclude that the district court did not abuse its discretion in denying the motion to compel and that Rush has failed to produce sufficient evidence to convince a reasonable factfinder that the District unlawfully discriminate in its refusal to rehire him, we affirm.

I.

The District employed Rush from 1983 to 1994, mainly as a teacher and coach. During his final year, Rush, who is black, was assistant principal at a middle school. He enjoyed an exemplary personnel record and received excellent performance evaluations and no disciplinary actions. The District tendered a renewal offer to him before the 1994-95 school year, but he never accepted. One week before the beginning of that year, he notified the District that he had accepted an assistant principal position with a high school in a different district.

In January 1995, an assistant principal position became available in one of the District's high schools, and Rush applied. The school's principal, T. Scott Murrah, and the District's superintendent, Ruben Dilworth, recommended Rush to the Board. When the Board met to discuss the recommendation, however, Board member Sara Jones opposed the recommendation, and the Board retired into an executive session at which, in accordance with usual practice, the District's attorney was present. The record contains no evidence regarding the matters discussed during the executive session,[1] but after returning from it the Board rejected the recommendation by a 3-2 vote.

In June of the same year, Rush again applied for an assistant principal position, this time at a different high school in the District. Once again, Dilworth and the principal, Bob Williford, recommended Rush. Williford also posted a notice that described Rush as the new assistant principal. The Board again rejected the recommendation, opting instead to offer the position to a white male with little or no experience in school administration. Rush requested a hearing,[2] but the District denied the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Jones's deposition testimony indicates that she had seen or heard of at least two separate interactions between Rush and his students that reflected unfavorably on his ability properly to impose discipline. The first involved Rush's unacceptable use of profanity during practices and games, as reported by parents. The second was an "overly harsh" exchange between Rush and a black male student. Rush disputes whether these events occurred.

[2] An affidavit filed by Pam Rush, the wife of King Rush, indicates that Board member Janette Adams typed a letter for Rush's signature,
(continued...)

request, citing a lack of controlling law or policy.

Finally, in 1997, Rush applied for another position as assistant principal. Once again, Williford recommended him, and Rush received an interview with the new superintendent, Owen Bush. Bush's deposition testimony indicates that Rush's responses during the interview failed to satisfy Bush, especially in the areas of instructional knowledge and the use of test scores for school improvement. Bush therefore declined to recommend Rush to the Board.[3]

## II.

On June 22, 1998, Rush sued the District and the Board members in their official and individual capacities, alleging, *inter alia*, racial discrimination in violation of the Fourteenth Amendment, seeking recovery under § 1983. He filed a motion to compel the disclosure of conversations held during an executive session. The court denied the motion on the ground of attorney-client privilege. After completing discovery, defendants moved for and obtained summary judgment on all claims and on the Board members' affirmative defense of qualified immunity.[4]

## III.
## A.

We review a discovery order for abuse of discretion. *See Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996). The discretion with which the trial court supervises discovery has been characterized as both "broad" and "considerable"; thus, "[i]t is unusual for an appellate court to find abuse of discretion in [discovery] matters . . . . Generally, we will only reverse the trial court's discovery rulings in unusual and exceptional cases." *Scott v. Monsanto Co.*, 868 F.2d 786, 793 (5th Cir. 1989) (citations and internal quotation marks omitted) (compiling authorities).

## B.

Evidentiary privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience, [except] with respect to an element of a claim or defense as to which State law supplies the rule of decision . . . ." FED. R. EVID. 501. The asserted privilege covers issues relating solely to Rush's § 1983 claims. Federal common law therefore governs the applicability of the privilege to the Board's communications during executive session. Under the common law of this circuit, "[a] corporate client has a priv-

_____

[2](...continued)
requesting the hearing. The affidavit also states that Adams commented to her that fellow Board members Jan Kling and Jones "did not have a legitimate reason for effectively blacklisting King David," leading to Pam Rush's conclusion that the "white board members dislike King David and refer to him as a bigot and a racist." Because, however, the record is devoid of testimony by Adams, we cannot determine what, if any, basis she had for taking such a position.

[3] The record is uncertain with respect to whether Bush had received unfavorable comments about Rush from Board members before forming his recommendations to the Board.

_____

[4] In addition to the protective order and the Fourteenth Amendment claims, Rush appeals the summary judgment on his claims under the First, Fourth, and Fifth Amendments and in favor of the individual defendants under the doctrine of qualified immunity. We see no reversible error with respect to these issues and, accordingly, affirm for the reasons discussed in the district court's opinion.

ilege to refuse to disclose, and prevent its attorneys from disclosing, confidential communications between its representatives and its attorneys when the communications were made to obtain legal services." *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999).[5] It follows that confidential communications between Board members and the District's attorney for the purpose of obtaining legal advice fall under the attorney-client privilege.

The communications that occurred during the executive session were not exclusively between the Board members and the attorney, however. Defendants concede that some occurred strictly between and among members of the Board, but they maintain that even those communications are protected by the privilege. Rush contends that, because such communications were not addressed to counsel, they do not benefit from the privilege.

In *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Court recognized that the corporate attorney-client privilege is designed to encourage full and frank communication between a corporation and its attorneys to facilitate fully informed legal advice and that the only way to ensure such communication is to construe the privilege broadly.[6] Similar policy dictates encouraging full communication between a school board and its

counsel. Therefore, the attorney-client privilege protects all communications during a meeting between a school board and its attorney for the purpose of obtaining legal advice, even those communications not addressed directly to the attorney. That is not to say, however, that the mere presence of an attorney serves to insulate a meeting from discoverySSthe privilege protects only those communications made for the purpose of obtaining legal advice.

The District's attorney participated in all the executive sessions, at each of which the Board discussed the legality of refusing to rehire Rush. There is nothing in the record indicating that any of the communications was for purposes other than the procurement of legal advice. While the Board members did discuss their reasons for refusing to rehire Rush, the discussions occurred in the context of inquiring about the legality of those reasons. Under these circumstances, the district court did not abuse its discretion in holding that the attorney-client privilege protects communications made during the executive sessions.

## IV.
### A.

We review a summary judgment *de novo*, applying the same standards as did the district court. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 205 (5th Cir.), *cert. denied*, 525 U.S. 1000 (1998). Summary judgment is appropriate where, viewing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party has made such a showing, "the nonmovant must go beyond the pleadings and designate the specific facts showing that there

---

[5] *See also* FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged . . . .").

[6] *See Upjohn*, 449 U.S. at 389-94 (rejecting a lower court's "control group" test in favor of a broader privilege covering all communications between employees and corporate counsel for purposes of rendering legal advice).

is a genuine issue for trial." *Urbano*, 138 F.3d at 205.

## B.

### 1.

For discrimination claims, we follow *Mc-Donnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Although *McDonnell Douglas* dealt with an action under title VII, we use the same analytical model when evaluating a claim under § 1983. *See Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959, 961-62 (5th Cir. Jan. 1981). Although the district court properly analyzed Rush's claims under the *McDonnell Douglas* standard, we must consider the intervening decision in *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097 (2000).

Under *McDonnell Douglas*, the plaintiff may establish a *prima facie* case by a preponderance of the evidence; then the defendant has the burden to produce evidence that the allegedly discriminatory action has a non-discriminatory justification. *See Reeves*, 120 S. Ct. at 2106. We assume *arguendo*, as did the district court, that Rush presents a *prima facie* showing of discrimination. As its legitimate, nondiscriminatory reason for refusing to hire Rush, the District offers his unsatisfactory interview responses. Because the defendant bears only the burden of production, not persuasion, *see id.*, we must accept the District's proffered justification.

If the defendant successfully asserts a non-discriminatory justification, "the McDonnell Douglas frameworkSSwith its presumptions and burdensSSdisappear[s]." *Id.* (internal quotation marks omitted). The plaintiff, however, still must be given "the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Moreover, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 2109.

In *Reeves*, however, the Court did allow that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* Indeed, even where the plaintiff shows pretext, "all that [such showing] proves . . . is that the [defendant's] decision-makers had some unidentifiable reason for not wanting to hire [the plaintiff]." *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 373 (5th Cir. 2000).

Rush alleges that the asserted justification for not hiring him is merely pretext and that, in reality, Bush's failure to recommend Rush to the Board resulted from improper influence exerted over Bush by individual Board members. Assuming, *arguendo*, that Rush can successfully show pretext,[7] he has failed to

---

[7] Despite Rush's repeated assertions to the contrary, the record does not at all plainly establish that Bush was improperly influenced by Board members before making his recommendation. The record establishes that Bush made a practice of discussing candidates with Board members before making official recommendations, but it fails to show that, with respect to Rush, this practice resulted in any influence over Bush, proper or improper. The only evidence tending to show any influence exerted by the Board over Bush is Rush's affidavit, in which he quotes Johnny Johnson as stating that Bush explained in a Board meeting that "'[Bush] had to follow the sentiments of the
(continued...)

produce any evidence of racial discrimination as a motivating factor in the decision not to hire him for the 1997 position. To the contrary, he asserts that the District refused to hire him because Jones carried a personal grudge against him, based on the way Rush had treated her child.

Moreover, the affidavit of Pam Rush asserts that the Board rejected Rush's application because some Board members considered him a bigot. Assuming, again without deciding, that these contentions have merit, they do not support Rush's allegations of racial discrimination.

The fact that Jones harbors a grudge against Rush or that the Board views him as a bigot is of no probative value in determining whether the decision not to hire him was motivated by racial discrimination. Even under *Reeves*, such a showing is insufficient to overcome a motion for summary judgment.[8] Because Rush has not produced any evidence of

racial discrimination by the Board, we affirm the summary judgment with respect to the 1997 discrimination claim.

### 2.

The district court found the 1995 claims barred by the applicable statute of limitations. Rush asserts (1) that the court improperly calculated the date from which limitations began to run and (2) that the District's 1997 decision not to rehire him tolled the statute of limitations. In the context of a § 1983 action, federal law governs the date on which the statute begins to run, while state tort law governs the limitation period and tolling provisions. *See Russell v. Board of Trustees*, 968 F.2d 489, 492-93 (5th Cir. 1992).

Under Mississippi's residual statute of limitations, the limitation period for the 1995 discrimination claims is three years. *See* MISS. CODE ANN. § 15-1-49 (1999). "The limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995).

Rush did not file this suit until June 22, 1998, so, absent any conditions that would toll the statute, a limitation period beginning before June 22, 1995, would bar the 1995 claims. The Board notified Rush of its decision not to hire him for the June 1995 position on June 15, 1995.

Although the record does not reflect when Rush received notice that he had not been hired for the January 1995 position, he presumably knew by June 15 that he had not been hired for that position either. In any event, according to Pam Rush's affidavit, the conversation in which Adams told Pam Rush

---

[7](...continued)
majority of the board'" with respect to the decision to hire Rush.

Rush has presented no evidence to establish that a majority of the Board does not have decisionmaking power with respect to hiring decisions. It is therefore difficult to see why a decision of a majority of the Board constitutes improper influence.

[8] *See Vadie*, 218 F.3d at 373-74 (affirming, under *Reeves*, judgment for the defendant as a matter of law where the plaintiff produced "nothing probative anywhere on the record of the ultimate question of . . . discrimination"). We note the recent reaffirmation that "[t]he standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56." *Reeves*, 120 S. Ct. at 2102.

that "the white board members did not 'care for King David Rush'" and that Rush should request a hearing to obtain a "'real reason' for the white board members [sic] rejection of his applications for employment" occurred on June 15.

Although Rush contends that he did not have sufficient information to form the basis for his claims until after June 22, "[a] plaintiff need not realize that a legal cause of action exists; a plaintiff need only know the facts that would support a claim" to trigger the limitation period. *See Piotrowski*, 51 F.3d at 516. To support a *prima facie* showing of discrimination under the *McDonnell Douglas* framework, a plaintiff need only show that he is a member of a protected class, that he qualifies for the job, that he failed to procure the job, and that the job remained open. *See McDonnell Douglas*, 411 U.S. at 801-02.

The events of June 15 informed Rush of all facts necessary to support a *prima facie* claim under *McDonnell Douglas*. His contention that he possessed insufficient information to start the limitation period lacks merit. Unless he can show that some event tolled limitations, the statute bars his 1995 claims.

Citing *Hendrix v. City of Yazoo City*, 911 F.2d 1102, 1103-04 (5th Cir. 1990), Rush argues that the "continuing violation" theory acts to toll limitations. Both branches of that theory, however, require some "violation" within the applicable statute of limitations to toll the statute. *See id.* Because we conclude, *supra*, that the 1997 decision not to hire Rush did not violate his Fourteenth Amendment rights, Rush has failed to produce any evidence of a violation within the limitation period that would support tolling under that theory.[9]

AFFIRMED.

---

[9] Even if the statute of limitations did not bar the 1995 claims, the claims would almost certainly fail for the same reasons as does the 1997 claim, discussed *supra*.